NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| KIANI BETTIS, JR., | CIVIL ACTION NO. 12-3436 (MLC) |
| Plaintiff, | **MEMORANDUM OPINION** |
| v. | |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

**COOPER, District Judge**

The plaintiff, Kiani Bettis, Jr. ("Bettis"), seeks review of the final decision of the defendant, the Commissioner of the Social Security Administration ("Commissioner"), denying his claim for Supplemental Security Income ("SSI"). (See dkt. entry no. 1, Compl.) See 42 U.S.C. § 405(g). The Court, for the reasons stated herein, will affirm the decision of the Commissioner.

BACKGROUND

Bettis, who was twenty-two years old at the time he filed his application for SSI benefits on January 22, 2010, has reportedly suffered from seizures since 2003. (Dkt. entry no. 10, Admin. R. at 24-27, Hr'g Tr.) At the time he filed his application, he was not working, and he had not worked since 2006. (Id. at 26.) In 2006, he had a seasonal job stacking boxes in a warehouse. (Id.) While on this job, he reported that he had approximately two seizures. (Id.) Aside from this, he has had "[n]o other jobs." (Id.) When asked why he did not have other jobs, he stated, "[n]ever had a chance, never really paid attention." (Id.)

Bettis, who has an eleventh-grade education, testified that he tried to find other work but that many jobs would not accept him because of his seizures.  (Id. at 25-27.)

Bettis testified in a hearing on July 8, 2011 that since the filing of his application for SSI benefits, he has had "more than ten" seizures and that he has gone to the emergency room every time.  (Id. at 28.)  His seizures occur "about every month or every two months."  (Id. at 29.)  According to Bettis, he often has seizures in his sleep, and he wakes up with his tongue "chewed on" and "blood on [his] pillow."  (Id.)  His muscles feel weak and tight until the next day.  (Id. at 29-31.)  Bettis also testified that he typically has headaches for a few hours after the seizures and that he cannot eat until the day after the seizure because his tongue is swollen.  (Id. at 30-31.)  In the past, Bettis has urinated on himself during his seizures, and once, he fell during his seizure and chipped his tooth.  (Id. at 30-32.)

Bettis testified that his daily activities including sitting around, talking to his sister and grandmother, and watching television.  (Id. at 38.)  He is able to play basketball if he has enough energy and the temperature is not too hot.  (Id. at 37.)  He is able to take the bus by himself.  (Id.)  He stated that he gets nervous being around people sometimes.  (Id.)  A hospital report from a nurse, Cynthia Hoffman RN, who had treated Bettis for a seizure, states that Bettis "has adequate support systems available, is able to ambulate independently, and can perform all activities of daily living without assistance."  (Admin. R. at 160, Easton Hosp. Rs.)

Medical records from Bettis's hospital visits that were provided to him inform him that seizures can be prevented and reduced through medication.  (See Admin. R. at 191-93, Univ.

Hosp. Rs.) Bettis takes Depakote and Dilantin for his seizures. (Hr'g Tr. at 30.) According to Bettis, "when [he] take[s] too much medication," he experiences side effects including hallucinations, panic attacks, and depression. (Id. at 33.) He reported that he sometimes takes more medication that he is prescribed because the seizures are "aggravating," and he tries "to stop them from coming." (Id.) Bettis also admitted that, at times, he forgets to take his medication or runs out of his medication. (Id. at 38.) At a hearing on July 8, 2011, Bettis presented several unfilled prescriptions that he "never used" from a variety of doctors. (Id. at 40-41.) Hospital records from various hospital visits for his seizures indicated that, while at times Bettis claimed to be compliant with medication, he often admitted that he had missed doses of his seizure medication. (See Univ. Hosp. Rs. at 237, 242; Admin. R. at 271, UMDNJ Hosp. Rs.; Admin. R. at 279-80, Sun Hosp. Discharge Summ.) These records also reveal that Bettis occasionally uses alcohol and drugs, specifically marijuana, against instructions given to him upon discharge from the emergency room. (Univ. Hosp. Rs. at 192, 233, 242, 251.)

## PROCEDURAL HISTORY

Bettis, alleging that he suffers from seizures, filed an application for SSI on January 22, 2010. (Admin. R. at 12, ALJ Decision.) His seizure disorder is the only physical, mental, or emotional condition that he listed on his Disability Report, and he listed January 22, 2010 in that report as the date on which his "condition[] became severe enough to keep [him] from working." (Admin. R. at 108-09, 1-22-10 Disability Report.) The Social Security Administration ("SSA") twice denied the written claim: first upon the initial filing, and again

upon a request for reconsideration. (ALJ Decision at 12.) Bettis thereafter filed a request for a hearing before an SSA administrative law judge ("ALJ"), which was granted and held on July 8, 2011. (Id.)

The ALJ issued an "Unfavorable Decision" on July 21, 2011 ("ALJ Decision"), which announced the ALJ's findings of fact and conclusions of law. (See ALJ Decision at 12-17.) The ALJ stated, inter alia, that:

1. [Bettis] has not engaged in substantial gainful activity since January 22, 2010, the application date[.]
2. [Bettis] has the following severe impairment: seizure disorder[.]
    . . . [T]he record also supports a finding that the claimant's impairments have lasted at a "severe" level for a continuous period of more than 12 months.
3. [Bettis] does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1[.]
    . . .
4. . . . [T]he [ALJ finds that Bettis] has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant must avoid working to heights and hazards.
    . . .
    . . . [T]he medical evidence notes that when the claimant has had seizures he has not been [compliant] with medication. . . .
    . . . This young man, if he follows prescribed treatment, is not disabled. . . .
    . . .
5. [Bettis] has no past relevant work[.]
6. [Bettis] was born on April 7, 1987 and was 22 years old, which is defined as a younger individual age 18-49, on the date the application was filed[.]
7. [Bettis] has a limited education and is able to communicate in English[.]
8. Transferability of job skills is not an issue because [Bettis] does not have past relevant work[.]

> 9. Considering [Bettis's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [Bettis] can perform[.]
> . . .
> [Bettis's] ability to perform work at all exertional levels has been compromised by nonexertional limitations. However, these limitations have little or no effect on the occupational base of unskilled work at all exertional levels. . . .
> 10. [Bettis] has not been under a disability, as defined in the [SSA], since January 22, 2010, the date the application was filed[.]

(Id. at 14-17 (citations omitted).) The ALJ, based on these conclusions, determined that Bettis was not entitled to SSI. (See id. at 17.)

Bettis sought review of the ALJ Decision by the SSA Appeals Council ("Appeals Council") on August 16, 2011. (Admin. R. at 7-8, Request for Review of Hr'g Decision/Order.) The Appeals Council denied the request for review of the ALJ Decision on May 24, 2012. (Admin. R. at 1-6, Appeals Council Denial.) Bettis timely filed the Complaint before this Court on June 6, 2012, seeking judicial review of the ALJ Decision. (See Compl.) See 42 U.S.C. § 405(g); Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 91 (3d Cir. 2007) ("Because the Appeals Council denied review of the ALJ's decision, we review that decision as the final decision of the Commissioner.").

Bettis outlines several points of error in the ALJ Decision. First, he argues that, at Step Five of the analysis, the ALJ only looked to the opinion of the non-examining State Agency consultant. Instead, pursuant to Social Security Ruling ("SSR") 96-9p, because the ALJ found nonexertional limitations, the ALJ should have consulted a vocational expert. (Dkt. entry no. 14, Pl.'s Br. at 10-11.) Bettis contends that the State Agency consultant also listed

"postural limitations restricting Mr. Bettis from never climbing ladders, ropes, and scaffolds," but the ALJ ignored this limitation in violation of SSR 96-9p, which "states that ALJs may not ignore the opinions of State Agency consultants and psychologists." (Id. at 11.) Second, Bettis argues that the ALJ, despite "implicitly acknowledg[ing] that Mr. Bettis demonstrated a mental impairment as a result of his seizure disorder," failed to comply with Acquiescence Ruling ("AR") 01-1(3) and instead relied on SSR 85-15. (Id. at 13.)

      The Commissioner opposes the appeal and argues that the ALJ Decision should be affirmed. (See dkt. entry no. 15, Comm'r Opp'n.) The Commissioner contends that Bettis did not rely on his alleged mental impairment as a basis for finding him disabled and instead treated it as a side effect of his medication; thus, Bettis did not carry his burden of demonstrating that his mental impairment amounted to a severe disability. (Id. at 6-7.) The Commissioner further asserts that the ALJ's residual functional capacity ("RFC") did incorporate the postural limitations found by the State Agency consultant. Specifically, the ALJ's RFC precluded Bettis from working at heights, and "[i]t defies logic how an individual could simultaneously utilize ladders, ropes, and scaffolds in their usual manner, yet not be working at heights." (Id. at 10.) The Commissioner also argues that the ALJ did not need to rely on vocational expert testimony because he expressly relied upon SSR 85-15, which states, "A person with a seizure disorder who is restricted only from being on unprotected elevations and near dangerous moving machinery is an example of someone whose environmental restriction does not have a significant effect on work that exists at all exertional levels." (Id. at 15.)

## DISCUSSION

**I.     Framework**

A claimant seeking SSI benefits generally bears the burden of proving that he or she was "disabled" during the period for which benefits are sought.  See 20 C.F.R. § 416.912(a). The Social Security Regulations establish a five-step sequential evaluation to be used in adjudicating whether an individual is disabled for the purposes of the SSA.  See 20 C.F.R. § 416.920(a).  Those steps are as follows:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. . . .
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 416.909, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. . . .
>
> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 to subpart P of part 404 of this chapter and meets the duration requirement, we will find that you are disabled. . . .
>
> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. . . .
>
> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled. . . .

Id.  "Residual functional capacity is defined as that which an individual is still able to do despite the limitations caused by his or her impairments." Pearson v. Barnhart, 380

F.Supp.2d 496, 505 (D.N.J. 2005) (citing 20 C.F.R. §§ 404.1545(a), 416.945). As to the fourth and fifth steps of the analysis, the claimant must "first demonstrate that he is unable to return to his former job because of physical or mental impairments." Kangas v. Bowen, 823 F.2d 775, 777 (3d Cir. 1987). If the claimant satisfies this requirement, the burden shifts to the Commissioner to show that, based on the claimant's RFC and vocational factors — i.e., "age, education and work experience" — the claimant can perform "some other kind of substantial gainful employment" in the national economy. Id.

## II. Standard of Review

The Court has jurisdiction to review the ALJ Decision, but the review is limited. See 42 U.S.C. § 405(g). The Court has plenary review of legal issues. See Schaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999). But the Court may only review the ALJ's findings of fact to determine whether they are supported by substantial evidence. See 42 U.S.C. § 405(g); Schaudeck, 181 F.3d at 431. "Substantial evidence," as defined in this context, is less than a preponderance of the evidence but "more than a mere scintilla"; it is such evidence "as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (citations omitted) (internal quotation marks omitted).

"[T]he substantial evidence standard is a deferential standard of review." Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004) (citation omitted). The Court will not set aside the ALJ Decision "if it is supported by substantial evidence, even if we would have decided the factual inquiry differently." Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).

8

Nevertheless, the Court "retain[s] a responsibility to scrutinize the entire record[.]"  Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981).

An ALJ decision must provide "sufficient development of the record and explanation of findings to permit meaningful review."  Jones, 364 F.3d at 505.  The ALJ is not required "to use particular language or adhere to a particular format in conducting his analysis," id., and the ALJ need not reference each and every treatment notation with particularity.  See Fargnoli v. Massanari, 247 F.3d 34, 42 (3d Cir. 2001).  But "[w]here competent evidence supports a claimant's claims, the ALJ must explicitly weigh the evidence and explain a rejection of the evidence."  Schaudeck, 181 F.3d at 435 (internal citation omitted).  The Court may not find that an ALJ decision is supported by substantial evidence unless the ALJ has analyzed the evidence and sufficiently explained the weight given to probative exhibits.  Bordes v. Comm'r of Soc. Sec., 235 Fed.Appx. 853, 861 (3d Cir. 2007).

**III.   Analysis of Claim**

The Court concludes that the ALJ Decision is supported by substantial evidence.  The Court disagrees with Bettis's assessment that the ALJ was required to consult a vocational expert.  The SSR on which Bettis relies, SSR 96-9p, refers to the usefulness of consulting a "vocational resource" in "more complex cases" or where "[t]he unskilled sedentary occupational base" is "significantly eroded" by the nonexertional limitations.  Soc. Sec. Admin., SSR 96-9p, Titles II and XVI: Determining Capability To Do Other Work — Implications of a Residual Functional Capacity for Less Than a Full Range of Sedentary Work, 61 Fed.Reg. 34478-01, 34483 (July 2, 1996).  In this case, the only nonexertional

limitations suggested by the State Agency consultant were that Bettis could never (1) work with hazards, such as dangerous machinery or heights, or (2) climb "ladder/rope/scaffolds." (Admin. R. at 180-81, Simpkins Physical RFC Assessment; see also Admin. R. at 188, Rizwan Med. Eval.)  These limitations do not suggest a "complex case[]" or a significant erosion of the "unskilled sedentary occupational base," necessitating the guidance of a vocational expert.  See SSR 96-9p, 61 Fed. Reg. at 34483.

The decision by the ALJ to not rely on a vocational expert is further justified by AR 01-1(3), which applies to claimants under the jurisdiction of the Court of Appeals for the Third Circuit.  AR 01-1(3) provides:

> In making a disability determination or decision at step 5 of the sequential evaluation process (or the last step in the sequential evaluation process in continuing disability review claims), we cannot use the grid rules exclusively as a framework for decisionmaking when an individual has a nonexertional limitation(s). Before denying disability benefits at step five when a claimant has a nonexertional limitation(s), we must:
> > (1) take or produce vocational evidence such as from a vocational expert, the DOT or other similar evidence (such as a learned treatise); or
> > (2) provide notice that we intend to take or are taking administrative notice of the fact that the particular nonexertional limitation(s) does not significantly erode the occupational job base, and allow the claimant the opportunity to respond before we deny the claim.
>
> This Ruling does not apply to claims where we rely on an SSR that includes a statement explaining how the particular nonexertional limitation(s) under consideration in the claim being adjudicated affects a claimant's occupational job base. When we rely on such an SSR to support our finding that jobs exist in the national economy that the claimant can do, we will include a citation to the SSR in our determination or decision.

Soc. Sec. Admin., AR 01-1(3), Sykes v. Apfel; Using the Grid Rules as a Framework for Decisionmaking When an Individual's Occupational Base is Eroded by a Nonexertional

10

Limitation — Titles II and XVI of the Social Security Act, 2001 WL 65745, at *4 (Jan. 25, 2001).

The ALJ explicitly relied upon SSR 85-15 here. The ALJ stated:

> Under SSR 85-15, the basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out and remember simple instructions, to respond appropriately to supervision, coworkers and usual work situations and to deal with changes in a routine work setting. The evidence does not demonstrate a substantial loss of these abilities.

(ALJ Decision at 17.) Thus, the ALJ complied with AR 01-1(3) by citing to SSR 85-15 in his finding "that jobs exist in the national economy that the claimant can do." See AR 01-1(3), 2001 WL 65745, at *4.

SSR 85-15 additionally states, "A person with a seizure disorder who is restricted only from being on unprotected elevations and near dangerous moving machinery is an example of someone whose environmental restriction does not have a significant effect on work that exists at all exertional levels." Soc. Sec. Admin., SSR 85-15, Titles II and XVI: Capability To Do Other Work — The Medical-Vocational Rules as a Framework for Evaluating Solely Nonexertional Impairments, 1985 WL 56857, at *8 (1985). Thus, under SSR 85-15, the type of disorder here --- seizure disorder --- does not significantly preclude a claimant from work at all exertional levels even where the same environmental limitations, heights and hazards, are present. For these reasons, the Court is not persuaded by Bettis's arguments that the ALJ's failure to consult a vocational expert warrants a remand.

The Court further concludes that the ALJ did not commit reversible error by failing to include the postural limitations recognized by a State Agency consultant, Nancy Simpkins

("Simpkins"), in the RFC. The postural limitations indicated by Simpkins were climbing ladders, ropes, and scaffolds. (See Simpkins Physical RFC Assessment at 180.) But Simpkins expressly placed no limitations on Bettis's climbing of "ramps/stairs" or on balancing. (Id.) Thus, it appears that Simpkins was only concerned about climbing when it is associated with heights. Furthermore, even if the ALJ were required to include these postural limitations in the RFC, the result would not be changed. SSR 85-15 states that "[w]here a person has some limitation in climbing and balancing and it is the only limitation, it would not ordinarily have a significant impact on the broad world of work." SSR 85-15, 1985 WL 56857, at *6. Thus, the Court is not persuaded that inclusion of the postural limitations would compel a finding that there were not significant jobs available in the national economy that Bettis could perform such that he is "disabled."

     Bettis has also argued that the ALJ improperly "prognosticated" when the ALJ concluded that Bettis is not disabled "if he follows prescribed treatment" because this was not supported by the record. (Pl.'s Br. at 13.) The Court disagrees and finds this conclusion amply supported by the record. Notably, Simpkins repeatedly referred to the fact that Bettis was "non compliant with meds" as the explanation for her assessment of Bettis's exertional and nonexertional limitations. (Simpkins Physical RFC Assessment at 179-82.) Similarly, hospital reports in the record also reveal a pattern of noncompliance with seizure medication, a fact expressly relied upon by the ALJ. (See Univ. Hosp. Rs. at 242; UMDNJ Hosp. Rs. at 271; Sun Hosp. Discharge Summ. at 279-80.)

The Court also agrees with the Commissioner that Bettis did not rely on any alleged mental impairment as a "disability" for the purpose of obtaining SSI benefits.  Rather, Bettis's mental-health issues were discussed as a side effect of his medications, particularly when he did not comply with the prescribed dosage.  (See Hr'g Tr. at 33-34.)  At his hearing, Bettis testified that the side effects of his medication included hallucinations, panic attacks, and depression "when [he] take[s] too much medication."  (Id. at 33.)  The Court finds no error in the ALJ's failure to impose additional nonexertional limitations on Bettis's RFC because substantial evidence in the record reveals that his alleged mental impairments are primarily related to his noncompliance with prescribed treatment.  The record demonstrates that he (1) missed doses of his medication, (2) took extra medication, and (3) used drugs and alcohol after being diagnosed with a seizure disorder.  (See Univ. Hosp. Rs. at 192, 233, 242, 251; UMDNJ Hosp. Rs. at 271; Sun Hosp. Discharge Summ. at 279-80.)

The Court, having fully reviewed the ALJ Decision and the Administrative Record, concludes that the ALJ Decision is supported by substantial evidence, and a remand for further assessment is not warranted.

## CONCLUSION

For the reasons discussed above, the Court will affirm the final decision of the Commissioner.  The Court will issue an appropriate Order.

   s/ Mary L. Cooper  
**MARY L. COOPER**  
United States District Judge

Date:       August 25, 2014